IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

No. 4:12-CV-226-FL

| | |
|---|---|
| LINDA A. EVANS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| PITT COUNTY DEPARTMENT OF | ) |
| SOCIAL SERVICES, et al., | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM AND
RECOMMENDATION**

This matter is before the court on the motion of Defendants' Pitt County Department of

Social Services ("DSS"), George L. Perry, Linda H. Million, Cynthia M. Ross and April Hanning[1]

(collectively, "Defendants") to dismiss [DE-25] the complaint of Plaintiff Linda A. Evans

("Plaintiff") for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2)

and for failure to state a claim for which relief can be granted pursuant to Federal Rule of Civil

Procedure 12(b)(6). Plaintiff responded to Defendants' motion to dismiss [DE-32] and Defendants

filed a timely reply [DE-33]. Accordingly, the pending motion is ripe for adjudication. The parties

have not consented to the jurisdiction of the magistrate judge; therefore, the motion is considered

here as a recommendation to the District Court. *See* 28 U.S.C. § 636(b)(1)(B); *see also* Local Civil

Rule 72.3(c). For reasons set forth below, this court recommends that Defendants' motion to dismiss

be allowed in part and denied in part.

---

[1]     Defendant Linda Curtis ("Curtis") is not a moving party with regard to the present motion
to dismiss. Defendant Curtis, proceeding pro se, filed an answer to Plaintiff's complaint on October
23, 2012 generally denying all allegations. [DE-24]. Therefore, the instant Memorandum and
Recommendation ("M&R") is not directed to any claims alleged against Defendant Curtis.

## I. FACTUAL BACKGROUND

As is proper when considering a motion to dismiss, this court will consider the facts in a light favorable to Plaintiff. Plaintiff initiated this action on September 28, 2012 by filing a complaint alleging several claims under 42 U.S.C. § 1983 along with state law claims, all arising from the actions of DSS and its employee Defendants in regard to an adult protective services case filed in 2009, on behalf of Plaintiff's mother, alleging physical and financial abuse by Plaintiff. Compl. [DE-1].

According to the complaint, Plaintiff is a 66-year old resident of Pitt County, North Carolina who moved home to live with and care for her elderly mother, Mae Bell Evans ("Mae Bell" or "Plaintiff's mother"), in 2006. Compl. [DE-1] ¶¶ 3, 14, 18, 30. Upon Plaintiff's move home, Plaintiff contacted a local attorney who was board certified in elder law matters in an effort to "get Mae Bell's affairs in order." *Id.* ¶ 17. On August 29, 2006, Mae Bell executed a Will, Revocable Living Trust, and Durable Power of Attorney naming Plaintiff as Mae Bell's "Attorney-In-Fact, Trustee and Executor." *Id.* ¶ 18; Defs.' Mem. Ex. 3 [DE-26-3]. In January 2007, Mae Bell began to decline physically and mentally and began having difficultly managing routine tasks. Compl. [DE-1] ¶¶ 20, 23, 25. In May 2007, Plaintiff was informed by the local elder law attorney that there would be a change in North Carolina law to extend the Medicaid "look back" period from three to five years. *Id.* ¶ 21. Thereafter, as Mae Bell's attorney-in-fact, Plaintiff transferred Mae Bell's real estate holdings, including Mae Bell's home, and assets through a gift deed to herself to ensure Mae Bell was eligible for Medicaid "in the event that nursing care [for Mae Bell] became unavoidable" in the future. *Id.* ¶¶ 21-22.

In June 2007, Mae Bell required more care and Plaintiff arranged for paid caregivers to come

2

into the home to care for her mother five days a week. *Id.* ¶¶ 23-25, 27. Caregiver Linda Curtis ("Curtis"), a named Defendant in this case, cared for Mae Bell beginning in June 2008. *Id.* ¶ 24. Sometime in 2008, Mae Bell's cash assets were insufficient to continue providing for in-home caregivers five days a week and, in order to obtain funds to continue in-home care, Plaintiff obtained a reverse mortgage on Mae Bell's home in the amount of $74,165.48 in June 2009. *Id.* ¶ 25.

On June 15, 2009, DSS social worker Defendant Cynthia Ross ("Ross") visited Mae Bell's home to conduct a routine follow-up on a report made to DSS regarding Mae Bell. *Id.* ¶ 30. Defendant Ross did not identify the name of the individual who made the report. *Id.* At the time of Ross' visit, Defendant Curtis was still the in-home caregiver for Mae Bell. *Id.* ¶¶ 24, 32. Plaintiff alleges that Defendant Curtis made false reports to DSS of events occurring inside the home, specifically in the nature of abuse, and also took possession of items within the home such as Mae Bell's will and related documents. *Id.* ¶ 32. Plaintiff also asserts that Defendant Curtis was acting as a "de facto agent" for DSS during 2009. *Id.* A month later, on July 12, 2009, Defendant Ross made a second unannounced visit to the home to ask more questions. *Id.* ¶ 34. Soon after, Plaintiff replaced Defendant Curtis with a new caregiver because of her alleged misconduct in false reporting to DSS and theft. *Id.* ¶ 35.

Defendant Ross returned to the home a third time on August 12, 2009 accompanied by Defendant Linda Million ("Million"), a DSS supervisor, and informed Plaintiff that she must leave her mother's house immediately or her mother would be taken to a nursing home. *Id.* ¶¶ 38, 39. Plaintiff objected vehemently to separating from her mother. *Id.* ¶ 39. An Emergency Petition for Adult Protective Services ("APS") was initiated by DSS that same day alleging that Mae Bell was a disabled adult who had been physically and emotionally abused by Plaintiff. *Id.* ¶ 40; Defs.' Mem.

3

Ex. 2 [DE-26-2] at 1-2. An Emergency Ex Parte hearing was held before a state district court judge whereby the judge entered an ex parte order finding that an emergency existed in the nature of physical and emotional abuse of Mae Bell by Plaintiff, thereby granting DSS authorization to provide necessary medical services and care to Mae Bell. Defs.' Mem. Ex. 2 [DE-26-2] at 3-4; Compl. [DE-1] ¶ 40. In the same ex parte order, the state district court set a hearing for August 20, 2009 for Mae Bell to show cause for dissolution or modification of the court's ex parte order. Defs.' Mem. Ex. 2 [DE-26-2] at 4. Plaintiff left her mother's home to live with friends although she alleges DSS and its attorneys made false statements of abuse at the hearing and throughout the investigative process. Compl. [DE-1] ¶¶ 41-43.

Over the course of the next weeks, several motions were filed by DSS and Plaintiff. DSS submitted a subsequent petition on August 13, 2009 alleging physical and emotional abuse, neglect of medical care, and exploitation by Plaintiff of her mother's financial resources. Defs.' Mem. Ex. 2 [DE-26-2] at 5-11. The petition requested that Plaintiff be removed as Mae Bell's attorney-in-fact, be ordered not to reside in her mother's home, be allowed supervised visitation rights and that DSS be authorized to provide care for Mae Bell. *Id.* at 10-11. Plaintiff sought a continuance of the hearing and at a proceeding on August 18, 2009, the state court ordered the hearing be continued to September 29, 2009. *Id.* at 14. The court also ordered that DSS be given access and authority to Mae Bell's bank accounts and that Plaintiff's accounts be frozen. *Id.*; Compl. [DE-1] ¶¶ 52, 53. Plaintiff maintains she was not permitted to be heard on the issue of freezing her accounts. Compl. [DE-1] ¶ 96.

A hearing was held on September 29, 2009 whereby various persons testified including DSS personnel, physicians and paid caregivers for Plaintiff's mother. *Id.* ¶ 46; Defs.' Mem. Ex. 2 [DE-

4

26-2] at 13-14. Plaintiff did not testify at the hearing and maintains that she was "relegated to the status of an audience member" during the hearing and not given a chance to defend herself. Compl. [DE-1] ¶¶ 53, 54. Plaintiff alleges that DSS personnel provided false statements in regards to her management of Mae Bell's affairs and failed to properly interview any friends or neighbors who could testify that Plaintiff was properly caring for her mother. *Id.* ¶¶ 46, 52-54, 62, 64, 67-70. In its order following the hearing, the state court directed that DSS provide care to Plaintiff's mother and maintain access to her financial assets, that Plaintiff's financial assets be frozen, that Plaintiff be limited to supervised visits at DSS' discretion, and that Plaintiff be terminated as Mae Bell's attorney-in-fact. *Id.* ¶ 46; Defs.' Mem. Ex. 2 [DE-26-2] at 20-21. In November 2009, DSS obtained guardianship of Mae Bell and revoked Plaintiff as Mae Bell's Attorney-In-Fact. Compl. [DE-1] ¶ 72. Plaintiff alleges that visits with her mother following DSS involvement were extremely limited to the point that she never had a "private moment with her mother until she visited her in the funeral home after her death" due to efforts by DSS to restrict her visitation. *Id.* ¶ 44-48.

In December 2009, Plaintiff was arrested by the Pitt County Sheriff's Department on allegations of financial and physical abuse of Mae Bell, which Plaintiff maintains was the result of DSS efforts to have Plaintiff criminally investigated. *Id.* ¶¶ 72-74. Plaintiff was released, but ultimately indicted for felony counts of embezzlement, fraud, elder abuse and medical neglect. *Id.* ¶¶ 77, 82. The charges were later dismissed. *Id.* ¶ 85. Also in December 2009, DSS moved Mae Bell to an Alzheimer's unit in a nursing facility. *Id.* ¶ 78. Plaintiff wrote a letter to Defendant Million warning against the placement of her mother in a facility because of the "tragic health effects . . . [it] would have on her mother." *Id.* ¶ 79. While at the nursing facility, Plaintiff's mother was not permitted to have visitors unless permission was obtained from Defendant Ross or Defendant

5

April Hanning ("Hanning"), another DSS social worker. *Id.* ¶ 80. Plaintiff alleges it was not feasible to visit her mother and, in fact, she did not do so while her mother was at the facility. *Id.* ¶¶ 80, 89, 90. In February 2010, suffering from a urinary tract infection and heart problems, Plaintiff's mother was transferred to Pitt Memorial Hospital in Greenville. *Id.* ¶ 88. Plaintiff visited her mother briefly on two occasions while she was in the hospital, but her visitation time was cut short when DSS docked her visitation time for a late arrival. *Id.* ¶¶ 88-89, 93. Plaintiff's mother returned home in late February 2010 and died on March 28, 2010. *Id.* ¶ 95.

Plaintiff alleges she has suffered violations of her constitutional rights, loss of physical liberty, and physical and emotional trauma due to the actions of DSS. *Id.* ¶ 96. Plaintiff purportedly brings this action under 42 U.S.C. §§ 1983 and 1988 for violation of her rights under the First, Fourth, Fifth, Seventh, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.[2] *Id.* ¶ 1. Defendant Perry has been sued in his official capacity only; Defendants Million, Ross and Hanning have been sued in their individual capacities only. *Id.* ¶¶ 5, 7-9. Plaintiff also asserts claims for abuse of process and intentional infliction of emotional distress. *Id.* ¶¶ 110-16. Plaintiff seeks compensatory and punitive damages in the present action. *Id.* at 15-16.

---

[2]      Plaintiff only mentions the Fifth Amendment in the opening paragraph of her complaint and fails to provide subsequent allegations supporting a Fifth Amendment claim. If, in fact, Plaintiff seeks to allege a violation of due process under the Fifth Amendment, such claim fails because the Fifth Amendment restricts actions only of the federal government. *See Betts v. Brady*, 316 U.S. 455, 462 (1942) ("Due process of law is secured against invasion by the federal Government by the Fifth Amendment and is safeguarded against state action in identical words by the Fourteenth.").

       Likewise, Plaintiff only mentions the Eighth Amendment in the opening paragraph of her complaint and fails to provide subsequent allegations supporting an Eighth Amendment claim.

       Plaintiff's claim under § 1988 is presumably Plaintiff's demand for an award of attorney's fees pursuant to her § 1983 actions; section 1988 is not otherwise alleged in the complaint.

## II. STANDARD OF REVIEW

Defendants have moved to dismiss Plaintiff's complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. [DE-25]. Also, Defendant DSS seeks dismissal of all claims asserted against it for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure on the grounds that DSS is not a legal entity capable of being sued. *Id.* Plaintiff opposes Defendants' motion and argues that sufficient facts have been set forth to support Plaintiff's claims, specifically in regards to the constitutional violations and state law claims alleged against Defendants. Pl.'s Resp. [DE-32] at 7-10.

Under Federal Rule of Civil Procedure 12(b)(2), the party asserting personal jurisdiction has the burden to prove the existence of a ground for jurisdiction by a preponderance of the evidence. *Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 (4th Cir. 2005). Where, as here, a court addresses the question of jurisdiction based only on the pleadings, the allegations in the complaint, the motion papers, and any supporting legal memoranda, without an evidentiary hearing, the burden is on the plaintiff to make a *prima facie* showing of a sufficient basis for jurisdiction. *Id.* In determining whether the plaintiff has proven a *prima facie* case of personal jurisdiction, the court "must draw all reasonable inferences arising from the proof, and resolve all factual disputes, in the plaintiff's favor." *Id.*

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). However, "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007). The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint, not to resolve conflicts

7

of fact or to decide the merits of the action. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243-44 (4th Cir. 1999). In considering a motion to dismiss, the court assumes the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 872 (4th Cir. 1989) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

However, the "'[f]actual allegations must be enough to raise a right to relief above the speculative level' and have 'enough facts to state a claim to relief that is plausible on its face.'" *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (quoting *Twombly*, 550 U.S. at 555); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 555 (citations omitted). Moreover, a court "need not accept the legal conclusions drawn from the facts" nor "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship.*, 213 F.3d 175, 180 (4th Cir. 2000).

## III. DISCUSSION

### A.     *Plaintiff's Claims against Defendant Pitt County DSS*

Plaintiff has asserted federal claims under 42 U.S.C. § 1983 and claims under state law against Defendant DSS. Compl. ¶¶ 13, 15. Defendant DSS seeks dismissal of Plaintiff's claims pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure on the grounds that Defendant DSS

8

is not a legal entity possessing the capacity to be sued. Defs.' Mem. [DE-26] at 5-6. Plaintiff does not appear to contest dismissal as to this Defendant. Pl.'s Resp. [DE-32] at 5.

"The capacity of a governmental body to be sued in the federal courts is governed by the law of the state in which the district court is held." *Avery v. Burke Cnty.*, 660 F.2d 111, 114 (4th Cir. 1981) (citing FED. R. CIV. P. 17(b)). In North Carolina, in the absence of a statute, "the capacity to be sued exists only in persons in being." *McPherson v. First & Citizens Nat. Bank of Elizabeth City*, 240 N.C. 1, 18, 81 S.E.2d 386, 397 (1954). Therefore, departments of municipalities and counties are not susceptible to suit without statutory authorization. *See Martin v. Mecklenburg Cnty. Park & Recreation Dep't*, No. 3:06-CV-290, 2006 WL 3780418, at *2 (W.D.N.C. Dec. 20, 2006). N.C. Gen. Stat. § 153A-11 acknowledges that a county is a legal entity which may be sued, but there is no corresponding statute authorizing suit against a county's DSS. Here, Plaintiff's claims against Pitt County DSS must be dismissed given that DSS is an agency or department of Pitt County and does not have the legal capacity to be sued. *See Moua v. Alexander Cnty.*, No. 5:09-CV-19, 2012 WL 252648, at *6 (W.D.N.C. Jan. 26, 2012) (dismissing § 1983 claims against Alexander County Department of Social Services on grounds that county agency did not have the capacity to be sued) (citations omitted); *Malloy v. Durham Cnty. Dep't of Soc. Servs.*, 58 N.C. App. 61, 66, 293 S.E.2d 285, 289 (1982) (holding that county department of social services has no capacity to sue or be sued). Accordingly, this court recommends that Defendants' motion to dismiss be allowed in this regard and that all claims against Defendant DSS (Counts 1, 4 & 5) be dismissed with prejudice.

## B. Plaintiff's Claims pursuant to 42 U.S.C. § 1983

Plaintiff alleges the following federal causes of action: (1) a derivative §1983 claim for failure to train and supervise against Defendant Perry in his official capacity as Director of Pitt

9

County DSS;[3] and (2) direct § 1983 claims against Defendants Million, Curtis, Ross, and Hanning, in their individual capacities for deprivation of Plaintiff's rights guaranteed by the First, Fourth, Seventh, Ninth, and Fourteenth Amendments.[4] Compl. [DE-1] ¶ 96a.

## i. Predicate Federal Claims

Plaintiff asserts several direct claims pursuant to § 1983. Specifically, Plaintiff alleges that Defendants Million, Curtis, Ross and Hanning violated her constitutional right(s)[5]

(1) under the First Amendment to freedom of speech;

(2) under the First, Ninth and Fourteenth Amendments to unfettered familial relations;

(3) under the Seventh Amendment to a jury trial;

(4) under the Due Process Clause of the Fourteenth Amendment to fair process; and

(5) under the Fourth Amendment to freedom from unreasonable searches and seizures by the

---

[3]  Plaintiff's This official capacity claim against Defendant Perry, as Director of Pitt County DSS, is considered by the court as a claim against Pitt County. *See Stevenson v. Martin Cnty. Bd. of Educ.*, 3 F. App'x 25, at *3 (4th Cir. 2001) (recognizing that an official capacity claim against a governmental official is treated as a suit against the government entity of which the official is an agent) (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)); *see Moua*, 2012 WL 252648, at 7. The court notes also that this is a derivative claim dependent on the existence of a predicate constitutional injury at the hands of an individual DSS employee.

[4]  Plaintiff's complaint creates confusion in its failure to clarify the alleged constitutional violations by Defendants Ross, Curtis, Million, and Hanning. Plaintiff lists a host of violations, yet fails to properly align her allegations with the alleged constitutional violation. Further, Plaintiff does not adequately specify which direct § 1983 claims are brought against which Defendants, rather states generally, in paragraphs 107 to 109, that Defendants Million, Ross, Curtis and Hanning violated "her constitutional rights under color of law." Compl. [DE-1] ¶ 108. Consequently, the court endeavors to decipher the specific constitutional violations alleged against the particular Defendants.

[5]  As previously noted by the court, *supra* note 1, because Defendant Curtis is not a movant to this motion to dismiss, the court does not address the direct § 1983 claims alleged against Defendant Curtis.

10

government.[6]

Compl. [DE-1] ¶¶ 96a, 97.

Section 1983 states as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Section 1983 is not a source of substantive rights itself, it merely provides "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). To state a claim pursuant to § 1983, a plaintiff must allege facts suggesting that her federal rights have been violated by state officials. *Braun v. Maynard*, 652 F.3d 557, 560 (4th Cir. 2011). "Under 42 U.S.C. § 1983, a plaintiff must establish three elements to state a cause of action: (1) the deprivation of a right secured by the Constitution or a federal statute; (2) by a person; (3) acting under color of state law." *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997). At present, Defendants do not dispute that Defendants Million, Ross and Hanning were acting under color of state law, leaving to the court's determination the issue of whether Plaintiff was deprived of certain constitutionally-recognized rights. Defs.' Mem. [DE-26] at 10-13.

The individual Defendants assert qualified immunity as a defense to Plaintiff's constitutional claims. The doctrine of qualified immunity, "when found to apply, bars § 1983 suits against

---

[6]     A review of Plaintiff's complaint indicates that allegations of a Fourth Amendment violation are confined to Defendant Curtis. Since Defendant Curtis is not a movant to the instant motion to dismiss, the court does not address the viability of this claim. *See* Compl. [DE-1] ¶¶ 32, 96-97 (stating that Plaintiff's Fourth Amendment rights were violated when "DSS directed a paid employee [Curtis] of Plaintiff to secretly spy and search and take personal documents belonging to Plaintiff from her home without any probable cause").

11

government officers in their individual capacity." *Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 330 (4th Cir. 2009). It "protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012) (quotation omitted). Accordingly, a qualified immunity defense "involves a two-step inquiry, asking first whether a constitutional violation occurred and second whether the right violated was clearly established." *Id.* (quotation omitted). A court can analyze these questions in either order. *Id.* at 188 n.6. For purposes of this motion, and for the reasons stated below, the court finds that where Plaintiff adequately alleges a cause of action against individual Defendants, she also adequately alleges a clearly established constitutional violation sufficient to overcome qualified immunity. *Cf. Clark v. Link*, 855 F.2d 156, 161 (4th Cir. 1988) ("If there is no violation of a federal right, there is no basis for a section 1983 action and no answer to a plea by the public officer of qualified immunity.").

### a. Free Speech

Plaintiff alleges that Defendants Million, Ross and Hanning interfered with her "constitutional right to freedom of speech to participate in Medicaid planning." Compl. ¶ 96. Defendants contend that there is no constitutional right to participate in Medicaid planning. Defs.' Mem. [DE-26] at 11.

"It is well established that the First Amendment protects expressive conduct as well as pure speech." *Willis v. Town of Marshall, N.C.*, 426 F.3d 251, 257 (4th Cir. 2005) (citing *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (recognizing there are limits to the type of conduct that the court will label as "speech")). Since the activity of "Medicaid planning" does not involve words, or pure speech, Plaintiff's conduct only warrants protection if it constitutes expressive conduct protected by

12

the First Amendment.[7]

Conduct is protected by the First Amendment when it is "sufficiently imbued with elements of communication." *Johnson*, 491 U.S. at 404. In deciding whether particular conduct possesses sufficient communicative elements to warrant First Amendment protections, courts must determine whether "[a]n intent to convey a . . . message [is] present, and [whether] the likelihood [is] great that the message w[ill] be understood by those who view [] it." *Id.* (quoting *Spence v. Washington*, 418 U.S. 405, 410-11 (1974)). Whether an activity is sufficiently communicative depends on the "nature of [the] activity, combined with the factual context and environment in which it was undertaken." *Tenafly Eruv Ass'n, Inc., v. Borough of Tenafly*, 309 F.3d 144, 158 (3d Cir. 2002) (citations and quotations omitted).

In this case, under the standard articulated in *Johnson* and *Spence*, the court finds that Plaintiff's "Medicaid planning" is not speech or conduct within the confines of the First Amendment. The nature of Plaintiff's alleged activity, "Medicaid planning," and the factual context and environment in which it was undertaken, lead to the conclusion that Plaintiff did not engage in a form of protected expression. Plaintiff's complaint does not suggest that she intended to convey a message through her alleged "Medicaid planning" activities and it does not appear that others would perceive any message from such conduct. Plaintiff merely alleges her actions, as Mae Bell's Attorney-In-Fact, to gift deed Mae Bell's property to herself were intended to make her mother eligible for Medicaid sooner under Medicaid's "look back" provision. Compl. [DE-1] ¶¶ 21, 22. Thus, viewing the complaint in the light most favorable to Plaintiff, Plaintiff cannot prove a set of

---

[7]     Plaintiff's allegations do not indicate that Plaintiff communicated through written or spoken word. Therefore, it is necessary to determine whether the "Medicaid planning" activity falls within the scope of the First Amendment.

facts which would establish a free speech violation under the First Amendment. Accordingly, Plaintiff has not alleged a right secured by the Constitution and the court recommends that Plaintiff's free speech claim against Defendants Million, Ross, and Hanning be dismissed.

### b. *Familial Relations*

Plaintiff also alleges three related claims against Defendants Million, Ross, and Hanning based on her alleged right to "unfettered familial relations" under the First, Ninth, and Fourteenth Amendments.

### *Fourteenth Amendment Substantive Due Process*

Plaintiff alleges that the actions of Defendants Million, Ross and Hanning violated her constitutional right "to have unfettered familial relations with her mother," thereby asserting she has a liberty interest protected by the Due Process Clause of the Fourteenth Amendment. Compl. [DE-1] ¶ 96. According to Plaintiff, when Defendants Million, Ross and Hanning instituted an APS action on behalf of Mae Bell and subsequently restricted Plaintiff's visitation rights with her mother, Plaintiff's rights with respect to her relationship with her parent were violated. *See id.* Defendants seek dismissal of this claim by contending that although the right to "familial privacy" has been long recognized, the "right of grown children to care for their elderly parents," which Plaintiff asserts, is not a due process right included in familial privacy. Defs.' Mem. [DE-26] at 11.

The Due Process Clause of the Fourteenth Amendment bars states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. While the Due Process Clause guarantees fair process, it also "includes a substantive component that provides heightened protection against government interference with certain fundamental rights and liberty interests." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). To state a substantive due process

14

claim, a plaintiff must allege: (1) that she has been deprived of "interests encompassed by the Fourteenth Amendment's protection of liberty and property," *Bd. of Regents v. Roth*, 408 U.S. 564, 569 (1972); and (2) that the deprivation was by some form of state action, *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999). "[W]here liberty interests are asserted as a basis for liability pursuant to § 1983, courts have consistently undertaken a threshold inquiry at the onset of litigation" to determine whether the plaintiff has alleged the deprivation of an actual constitutional right. *McCurdy v. Dodd*, 352 F.3d 820, 826 (3d Cir. 2003). For a substantive due process claim, a plaintiff must also show that the state's action is so arbitrary and egregious that it "shocks the conscience." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

In order to properly analyze Plaintiff's substantive due process claim, the court first determines whether Plaintiff has alleged a constitutional interest entitled to protection. If Plaintiff fails to assert a protected interest, there are no due process concerns and Plaintiff's claim fails. *See Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172 (4th Cir. 1988). Here, Plaintiff is asserting a fundamental liberty interest in familial privacy – that of continued companionship with her mother.[8] The Third Circuit in *McCurdy* described well the court's task when addressing claims based on liberty interests:

Although we are mindful of the broad remedial purposes of § 1983, we must also

---

[8]    Plaintiff's complaint alleges that her ability to visit her mother was limited and restricted: (1) "Defendant Ross informed Plaintiff that her limited visitation of her mother would be further restricted," Compl. [DE-1] ¶ 44; (2) "DSS further restricted [Plaintiff's] visits at a hearing," *Id.* ¶ 46; (3) "[Plaintiff's] visitations then became one hour once a week, supervised; not long after, Million grinned and told [Plaintiff] that her regular weekly visits were ending and her visitation would be whenever it was convenient for DSS," *Id.* ¶ 48; and (4) "[Plaintiff] never again had a private moment with her mother until she visited her in the funeral home after her death." *Id.* ¶ 49. Based on these and other similar allegations, the court construes the nature of the liberty interest being asserted by Plaintiff as one of companionship with her mother.

15

recognize that, in § 1983 cases grounded on alleged [] liberty interests, we are venturing into the murky area of unenumerated constitutional rights.

. . . .

The contours of legal concepts such as liberty interests and fundamental rights are amorphous and indistinct; therefore, we have cautioned that [a]ddressing the substantive due process claim . . . requires scrupulous attention to the guideposts that have previously been established. As the Supreme Court notes in *Glucksberg*: By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore exercise the utmost care . . . .

*McCurdy*, 352 F.3d at 825-26 (referring to *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997))

(quotations and citations omitted). The Fourth Circuit has noted the following as to the protections

afforded the family:

[T]he sanctity of the family unit is a fundamental precept firmly ensconced in the Constitution and shielded by the Due Process Clause of the Fourteenth Amendment. The concept of familial privacy has been restricted by the Supreme Court to (1) thwarting governmental attempts to interfere with particularly intimate family decisions, and (2) voiding government actions that sever, alter, or otherwise affect the parent/child relationship.

*Hodge v. Jones*, 31 F.3d 157, 163 (4th Cir. 1994) (internal citations and quotation marks omitted).

However, the "maxim of familial privacy is neither absolute nor unqualified, and may be outweighed

by a legitimate governmental interest." *Id.* at 163-64 (citing *Lehr v. Robertson*, 463 U.S. 238, 256

(1983) (recognizing constitutional protection is available for the parent-child relationship in

"appropriate cases")).

Here, Plaintiff's allegations implicate the second aspect of familial privacy noted by the court

in *Hodge* – that of the parent-child relationship. It is well-settled that the Due Process Clause

protects certain narrow fundamental rights with respect to the parent-child relationship. However,

neither the United States Supreme Court nor the Fourth Circuit has addressed the precise issue

16

presented by Plaintiff – whether the concept of familial privacy includes protection for an adult child in the companionship of its parent. There are, however, ample cases discussing the nature of the liberty interest between parent and child and this court will use those as "guideposts" in the present discussion.[9]

First, the Supreme Court has, on multiple occasions, affirmed that the parent's liberty interest includes a custodial right which protects the right of parents to make decisions about the care and upbringing of their children. *Troxel*, 530 U.S. at 66 (recognizing that the essence of the parents liberty interest is the right to make decisions concerning the rearing of their children); *Wisconsin v. Yoder*, 406 U.S. 205, 234 (1972); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) (recognizing a parental liberty interest in the "custody, care and nurture of the child"); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534 (1925) (affirming the right of parents to direct the upbringing of their children); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (recognizing the right of parents to bring up their children and be in control of their education).

Second, it is less clear whether a parent's liberty interest also includes a companionship right with their child. The Supreme Court has not explicitly considered whether the parental liberty interest includes a companionship interest with a child, but in *Stanley v. Illinois*, 405 U.S. 645, 651 (1972), the Supreme Court referred to a parent's liberty interest using the term "companionship." However, the Court recognized this "companionship" interest in the context of its previous decisions, as discussed above, which recognized the parent's right to the custody and care of a minor

---

[9]     Plaintiff's allegations indicate that the actions of Defendants Million, Ross, and Hanning were directly aimed at Plaintiff's relationship with her mother. *See Shaw v. Stroud*, 13 F.3d 791, 804-05 (4th Cir. 1994) (stating that state action *only* incidentally affecting the familial relationship is not cognizable under a § 1983 due process claim).

17

child without explicitly indicating an intention to recognize a companionship interest. *Id.*; *see Butera v. District of Columbia*, 235 F.3d 637, 655 (D.C. Cir. 2001) (noting that the *Stanley* decision does not explicitly recognize a companionship interest separate and apart from the custodial cases regarding the right of parents to make decisions regarding the custody and care of children); *McCurdy*, 352 F.3d at 827 (same). After *Stanley*, many Circuit Courts have addressed whether a parent has a constitutionally protected right to the companionship of his or her child, but primarily in the context of an adult child, and found that no such right is protected under the Due Process Clause. *Russ v. Watts*, 414 F.3d 783, 790-91 (7th Cir. 2005) (overruling its prior decision and finding no protected interest for a parent's companionship with an adult child); *Robertson v. Hecksel*, 420 F.3d 1254, 1260 (11th Cir. 2005) (declining to expand the substantive due process protections to include a parent's right to companionship with an adult child); *McCurdy*, 352 F.3d at 829; *Butera*, 235 F.3d at 655 (holding that a parent-child relationship between two independent adults does not invoke constitutional "companionship" interests); *Valdivieso Ortiz v. Burgos*, 807 F.2d 6, 8-9 (1st Cir. 1986); *but see Kelson v. Springfield*, 767 F.2d 651, 655 (9th Cir. 1985) (recognizing generally that parents have a constitutionally protected liberty interest in the companionship of their child); *Smith v. City of Fontana*, 818 F.2d 1411 (9th Cir. 1987), *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999) (confirming the right of a parent to claim a companionship interest); *Trujillo v. Bd. of Cnty. Comm'rs*, 768 F.2d 1186, 1189 (10th Cir. 1985) (recognizing a parent's constitutionally protected interest with her adult son, but under the First Amendment's right of association).

Third, while few courts have discussed the rights of children with respect to the parent-child relationship, the Ninth Circuit has held that the protected interest in familial companionship extends

18

to protect children as well by the fact that a "child's interest in her relationship with a parent is sufficiently weighty by itself to constitute a cognizable liberty interest." *Smith*, 818 F.2d at 1418-19 ("The companionship and nurturing interests of parent and child in maintaining a tight familial bond are reciprocal, and we see no reason to accord less constitutional value to the child-parent relationship than we accord to the parent-child relationship."). Some district court's have also analyzed the rights of minor children and reached similar conclusions. *See Doswell v. City of Pittsburgh*, No. 07-761, 2007 WL 2907886, at *4 (W.D. Pa. Oct. 2, 2007) (finding that minor child had a claim for deprivation of the companionship of his father); *Mombourquette v. Amundson*, 469 F. Supp. 2d 624, 654 (W.D. Wis. 2007) (finding circuit precedent did not foreclose claim by minor child regarding loss of companionship of parent).

As a final guidepost, this court notes that the age of the child is important when looking to existing Supreme Court and Circuit precedent. This court has gleaned, mostly from the cases previously cited, that courts addressing rights within the parent-child relationship appear to recognize or deny liberty interests based on the age of the child. As the Third Circuit has noted, Supreme Court "cases extending liberty interests of parents under the Due Process Clause focus on relationships with *minor* children." *McCurdy*, 352 F.3d at 827 (emphasis in original); *see Meyer*, 262 U.S. at 399 (involving a minor child); *Pierce*, 268 U.S. at 534 (same); *Prince*, 321 U.S. at 166 (same); *Troxel*, 530 U.S. at 66 (same); *Wisconsin*, 406 U.S. at 234 (same). Further, the Circuit Court cases denying the parental right to companionship concern parents claiming rights with regard to an adult child and rely heavily on the view that "minor children's need for the guidance and support of their parents warrants 'sharply different constitutional treatment.'" *Russ*, 414 F.3d at 790 (quoting *Butera*, 235 F.3d at 656 & *McCurdy*, 352 F.3d at 829). Thus, the recognition of rights stemming from the parent-

19

child relationship arise almost exclusively in the context of minor children.

With these principles in mind, the court now turns to the liberty interest asserted by Plaintiff. Here, the right asserted by Plaintiff is simply not consistent with existing Supreme Court precedent establishing familial privacy. Plaintiff has failed to cite, and this court has not identified, authority from either the Supreme Court or Fourth Circuit recognizing this particular interest. *See Jordan by Jordan v. Jackson*, 15 F.3d 333, 343 n.10 (4th Cir. 1994) (noting that whether children have a cognizable interest in the companionship and supervision of their parents has not been decided by the Supreme Court). Further, familial privacy cases from other circuits regarding the parent-child relationship and focusing on the right of family to remain together without government interference relate almost exclusively to the parent-child relationship as it involves a minor child, not an adult child. *See McCurdy*, 352 F.3d at 827 (recognizing that the "liberty interests of parents under the Due Process Clause focuses on relationships with *minor* children"); *Butera*, 235 F.3d at 656 (holding that a parent-child relationship between two independent adults does not invoke constitutional "companionship" interests). Moreover, cases from the Supreme Court and other circuits deal primarily with the rights of the parent in connection with the parent-child relationship and the Fourth Circuit has not recognized reciprocal rights for adult children to support a leap by this court in recognizing the substantive right Plaintiff asserts. *Cf. Stratton v. Mecklenburg Cnty. Dep't Soc. Servs.*, No. 11-2131, 2013 WL 2364587, at *14 (4th Cir. May 31, 2013) (Gregory, J. concurring) (noting that neither the Fourth Circuit nor the Supreme Court has decided whether a child has a liberty interest in the companionship and supervision of their parents, but assuming, for purposes of analysis, that the *minor* child did have such a liberty interest).

The court does not dispute that there are likely strong emotional bonds between Plaintiff and

20

her mother, however, the existence those emotional bonds does not inherently grant Plaintiff a fundamental right under the Due Process Clause. Accordingly, Plaintiff has failed to allege a right secured by the Constitution and the court recommends that Plaintiff's substantive due process claim against Defendants Million, Ross and Hanning be dismissed.

## First Amendment Right to Association

At the outset, the court notes that Plaintiff's claim for violation of her First Amendment right to "unfettered family relations," is more aptly categorized as her right to freedom of intimate association.[10] However, although Plaintiff makes reference in her complaint to the First Amendment's guarantee of the alleged associational right, this court construes this claim as one more properly analyzed consistent with the Fourteenth Amendment's due process guarantees as discussed above. Plaintiff alleges the same facts to support her First Amendment claim as she does to support her substantive due process claim and a review of case law supports such finding.

The Supreme Court recognizes the "right to associate with others in pursuit of a wide variety of political, social, economic, education, religious, and cultural ends." *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984). In recognizing such right, the Court has acknowledged that citizens enjoy protected rights of association in two distinct forms: (1) the right to maintain certain intimate human relationships (categorized as intimate association); and (2) the right to associate for the purpose of engaging in activities protected by the First Amendment (categorized as expressive

---

[10]     Plaintiff does not directly describe her claim under the First Amendment as a right to intimate association, but the court construes it as such based on Plaintiff's allegations that it is the relationship between her and her mother that has allegedly been disrupted. *See Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*, 229 F.3d 435, 441-42 (3d Cir. 2000) ("Family relationships are the paradigmatic form of protected intimate associations[.]") (citations and quotations omitted).

association). *Id.* at 617-18; *see Wolford v. Angelone*, 38 F. Supp. 2d 452, 462-63 (W.D. Va. 1999) ("Included in this right of association is the right to enter into certain intimate or private relationships, such as family relationships.").

Neither the Supreme Court nor the Fourth Circuit has addressed the precise source of the intimate association right, although the Supreme Court has explained that the right to intimate association "receives protection as a fundamental element of personal liberty." *Roberts*, 468 U.S. at 618; *see also Adler v. Pataki*, 185 F.3d 35, 42 (2d Cir. 1999) (noting that it is unclear from which amendment the right of intimate association is derived as it has not been "authoritatively determined"). However, most courts have recognized that rights of intimate association based on family relationships derive from the Due Process Clause of the Fourteenth Amendment. *See Rees v. Office of Children & Youth*, 744 F. Supp. 2d 434, 443 n.1 (W.D. Pa. 2010) (concluding that plaintiff's claim under the First Amendment to intimate family association is properly construed to arise under the Fourteenth Amendment's due process protections); *Campos v. Weissman*, No. 9:07-CV-1263, 2009 WL 7771872, at *5 (N.D.N.Y. Sept. 10, 2009) ("Generally, courts faced with this issue seem to agree that intimate association claims related to rights of speech and petition are analyzed under the First Amendment's Freedom of Association Clause, while claims related to familial relationships fall under the liberty interests protected by the Substantive Due Process component of the Fourteenth Amendment."); *Garten v. Hochman*, No. 08-CIV-9425, 2009 WL 302267, at *6 (S.D.N.Y. Jan. 28, 2009) (holding intimate relationship claims with regard to parent-child relationships arise under the Fourteenth Amendment, not the First); *Fischer v. The City of Portland*, No. CV-02-1728, 2003 WL 23537982, at *5 (D. Or. Nov. 18, 2003) ("Accordingly, this

22

Court concludes Plaintiff's right of intimate association is not a First Amendment right, but is derived from the substantive due process protections provided under the Fourteenth Amendment.").

This court agrees that the right to intimate association with family members is rooted in the Due Process Clause. Therefore, Plaintiff's familial association claim under the First Amendment is essentially a restatement of Plaintiff's Due Process claim under the Fourteenth Amendment. Since the court previously determined that Plaintiff failed to establish a protected right under the Due Process Clause, the court recommends that Plaintiff's First Amendment intimate association claim against Defendants Million, Ross and Hanning be dismissed.

### Ninth Amendment

Plaintiff also asserts that her right to "unfettered familial relations" finds protection in the Ninth Amendment. Compl. ¶ 96.

The integrity of the family unit has been found to be protected under the Ninth Amendment. *See Griswold v. Connecticut*, 381 U.S. 479, 492-96 (1965) (Goldberg, J., concurring) (concluding that the Ninth Amendment "shows a belief . . . that fundamental rights exist that are not expressly enumerated in the first eight amendments"). "However, the Ninth Amendment is 'a rule of construction, not one that protects any specific right,' and so '[n]o independent constitutional protection is recognized which derives from the Ninth Amendment and which may support a §1983 cause of action.'" *Diaz v. City of New York*, No. 00-CV-2944, 2006 WL 3833164, at \*7 (E.D.N.Y. Dec. 29, 2006) (citing *Williams v. Perry*, 960 F. Supp. 534, 540 (D. Conn. 1996) (concluding that a § 1983 claim based on the Ninth Amendment fails to state a claim)).

Accordingly, the court recommends that Plaintiff's Ninth Amendment claim against Defendants Million, Ross and Hanning be dismissed.

23

### c.  *Procedural Due Process*

Plaintiff alleges that Defendants interfered with her constitutional right to "freedom from government action that takes one's family and finances without due process of law" thereby generally identifying a procedural due process right challenging the adequacy of the procedures employed in the DSS case.[11] Compl. [DE-1] ¶¶ 96, 97, 80. Reading Plaintiff's allegations together, Plaintiff asserts two types of interests were infringed without fair process: (1) a liberty interest in familial privacy as already discussed; and (2) a property interest in her money and real estate. Specifically, Plaintiff argues that her procedural due process rights were violated when she was denied the right to participate in the hearings regarding her mother's DSS case and the freezing of her assets. *Id.* ¶ 96a. Plaintiff alleges that she was "unable to defend herself" against false accusations during hearings in state court and not allowed to a be party in the action. *Id.* ¶¶ 53, 71.

To state a procedural due process claim, a plaintiff must show "(1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) that the procedures employed were constitutionally inadequate." *Iota Xi Chapter of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 145 (4th Cir. 2009). Liberty interests may be derived directly from the Due Process Clause or created by state law, *Hawkins v. Freeman*, 195 F.3d 732, 748 (4th Cir. 1999), while property interests are not created by the Constitution, but "stem from an independent source such as state law." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985) (citing *Bd. of*

---

[11]    In substance, Plaintiff's procedural due process claim is directed against only Defendants Million and Ross, not Defendant Hanning. Compl. [DE-1] ¶ 80. Plaintiff's response states that the complaint's allegations are confined to the actions of Defendants Million and Ross, as Defendant Hanning subsequently replaced Defendant Ross in December 2009. Pl.'s Resp. [DE-32] at 8. Accordingly, the court construes Plaintiff's response as relinquishing any procedural due process claim Plaintiff may have initially alleged against Defendant Hanning.

24

*Regents*, 408 U.S. at 577). The Supreme Court has noted the following with respect to the due process clause

> The due process clause does not guarantee to the citizen of a state any particular form or method of state procedure. . . . Its requirements are satisfied if he has reasonable notice and reasonable opportunity to be heard and to present his claim or defense; due regard being had to the nature of the proceedings and the character of the rights which may be affected by it.

*Dohany v. Rogers*, 281 U.S. 362, 369 (1930). "Procedural due process provides merely 'a guarantee of fair procedures – typically notice and an opportunity to be heard.'" *Wolf v. Fauquier Cnty. Bd. of Supervisors*, 555 F.3d 311, 323 (4th Cir. 2009) (quoting *Mora v. City of Gaithersburg*, 519 F.3d 216, 230 (4th Cir. 2008)). Although due process generally requires an opportunity to be heard prior to the deprivation of a property interest, a post-deprivation remedy may be adequate in some cases. *Gilbert v. Homar*, 520 U.S. 924, 930 (1997). Therefore, "it is necessary to ask what process the State provided, and whether it was constitutionally adequate. This inquiry would examine the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law." *Zinermon v. Burch*, 494 U.S. 113, 126 (1990). In assessing a procedural due process claim, there must have been a deprivation of a protected liberty or property interest by state action, otherwise the question of adequate process is irrelevant. *Stone*, 855 F.2d at 172.

First, the court addresses Plaintiff's claim that her procedural due process rights were violated with respect to her alleged liberty interest regarding her relationship with her mother. Given the court's previous determination that Plaintiff has failed to allege a liberty interest protected under the Due Process Clause, Plaintiff's procedural process claim predicated on this asserted liberty interest

25

fails. *Stone*, 855 F.2d at 172 (noting there must be a deprivation of a protected liberty interest for procedural due process concerns to arise).

Second, the court considers whether Plaintiff has sufficiently alleged a constitutional property interest to warrant procedural due process protections. *See Sullivan*, 526 U.S. at 59 (recognizing that the first step in assessing any due process claim is to ensure that the plaintiff actually has a cognizable property interest that has been jeopardized by governmental action). It is well-settled that property interests protected by procedural due process include ownership of real estate and money. *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 789 (2005) (recognizing that property interests "extend well beyond actual ownership of real estate, chattels, or money"). Plaintiff's complaint states that her bank accounts and real estate holdings were frozen in the DSS action pursuant to state court orders on August 18, 2009 and September 29, 2009, with her bank accounts being subsequently liquidated. Compl. [DE-1] ¶¶ 52, 96a. Having alleged the bank accounts and property belonged to her, Plaintiff has sufficiently alleged a protected property interest that was deprived. *Gonzales*, 545 U.S. at 789.

Here, assuming the truth of Plaintiff's allegations, as the court must at this stage, Plaintiff has satisfactorily alleged a procedural due process violation against Defendants Million and Ross. Plaintiff alleges that she was "denied any right to even participate in hearings about . . . the freezing of all her bank accounts and real estate," generally alleging denial of an opportunity to be heard during the DSS hearings on August 18, 2009 and September 29, 2009, the effect of which froze her bank accounts and other property. Compl. [DE-1] ¶ 96a. The allegations in Plaintiff's complaint, as such, are sufficient to state a claim for relief that is plausible on its face. *See Twombly*, 550 U.S. at 547 (holding that a plaintiff must plead enough facts to state a claim for relief that is plausible on

26

its face, as opposed to merely conceivable on some undisclosed set of facts). Nothing in the record included with the pleadings, of which this court may properly consider at this stage, militates against the plausibility of Plaintiff's allegations.[12] While the state court order from October 12, 2009 indicates that Plaintiff was represented by counsel and elected not to testify at the September 29, 2009 hearing, Plaintiff also alleges that she was not permitted an opportunity to be heard at the August 18, 2009 hearing regarding the freezing of her accounts. Defs.' Mem. Ex. 2 [DE-26-2] at 14. The state court's October 12, 2009 order confirms that on August 18, 2009, the court ordered all of Plaintiff's accounts be frozen. *Id.* The only other information the court order indicates is that Plaintiff's counsel filed a motion to continue and a hearing on said motion was held on August 18, 2009. *Id.* Apart from this brief statement describing the events on August 18, 2009, there is no information in the public record as to (1) the process by which the issue regarding the freezing of Plaintiff's bank accounts was presented to the court– whether by motion or otherwise; (2) whether the freezing of Plaintiff's bank accounts was ordered during the hearing on the motion to continue or occurred separately on August 18, 2009; and (3) who was heard or was provided an opportunity to be heard regarding the freezing of Plaintiff's accounts on August 18, 2009. *Id.* There is no court order or other matter of public record before this court detailing the events of August 18, 2009 from which the court could infer Plaintiff's allegations, as to not receiving a meaningful opportunity to be heard regarding her property interests, are implausible. Though Defendants dispute the factual issue of whether Plaintiff was denied an opportunity to be heard, Defendants have not demonstrated

---

[12]    "[A] federal court may consider matters of public record such as documents from prior state court proceedings in conjunction with a Rule 12(b)(6) motion." *See Walker v. Kelly*, 589 F.3d 127, 139 (4th Cir. 2009).

27

a legal argument foreclosing Plaintiff's claim or provided sufficient information from the public record to show Plaintiff was afforded due process.

Further, Defendants have not demonstrated that they are entitled to qualified immunity at the dismissal stage. Courts are clear that procedural due process requires a person have an opportunity to be heard at a meaningful time and in a meaningful way. *See Tri Cnty. Paving, Inc. v. Ashe Cnty.*, 281 F.3d 430, 436 (4th Cir. 2002). Here, Plaintiff's allegations are sufficient to demonstrate the violation of a clearly established right at this stage in the proceedings. Accordingly, the court recommends that Defendants' motion to dismiss be denied as to Plaintiff's procedural due process claim against Defendants Million and Ross.

### d. *Right to Jury*

Plaintiff's complaint also alleges that Defendants Million, Ross, and Hanning interfered with her constitutional right to "a jury trial when her funds are at issue." Compl. [DE-1] ¶ 96a. While this claim appears to be an extension of Plaintiff's procedural due process claim, the court addresses it separately nonetheless.

At the outset, the court notes that Plaintiff's claim based on the Seventh Amendment's preservation of a civil jury trial right is meritless because this right has not been extended to the states through the Fourteenth Amendment. *Letendre v. Fugate*, 701 F.2d 1093, 1094 (4th Cir. 1983); *McArthur v. Clark*, No. 5:05-CV-634-FL, 2006 WL 4759223, at *5 (E.D.N.C. May 24, 2006); *Everett v. Crossroads*, No. 5:04-CV-805-BR, 2004 WL 3591320, at *1 (E.D.N.C. Nov. 4, 2004). "State court proceedings are not governed by the Seventh Amendment, but by corresponding provisions in state constitutions." *Boyd v. Bulala*, 672 F. Supp. 915, 921 (W.D. Va. 1987). Here, the basis of Plaintiff's complaint concerns an action in a North Carolina state court, specifically an

28

APS case instituted by DSS. Accordingly, this court recommends that Plaintiff's Seventh Amendment claim against Defendants Million, Ross and Hanning be dismissed.

### ii. Derivative Federal Claims

A municipality "cannot be held liable solely because it employs a tortfeasor . . . in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Rowell v. City of Hickory*, 341 F. App'x 912, 915 (4th Cir. 2009) (quoting *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 691 (1978)). Rather, it is "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* (quoting *Monell*, 436 U.S. at 694). A plaintiff may prevail on such a claim only if an individual defendant violated a specific constitutional right of that plaintiff, and that specific violation was caused by an unconstitutional policy or custom of the county. *Vathekan v. Prince George's Cnty.*, 154 F.3d 173, 180-81 (4th Cir. 1998). A policy or custom for which a municipality may be held liable can arise in four ways: "(1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifests deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law." *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quotations omitted).

While a municipality's alleged failure to train may serve as the basis for municipal liability, it only does "[i]n limited circumstances." *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a

29

failure to train." *Id.* (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822-23 (1985) (recognizing that a policy of inadequate training is "far more nebulous" than other alleged municipal policies)). A failure to train must amount to "deliberate indifference" towards the rights of persons with whom employees come in contact in order to constitute a policy or custom actionable in a §1983 claim. *Canton v. Harris*, 489 U.S. 378, 389 (1989). Further, "deliberate indifference" is a "stringent standard of fault, requiring proof that the municipal actor disregarded a known or obvious consequence of his action." *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997).

In this claim, Plaintiff specifically alleges that Defendant Perry failed to train his DSS employees on how to properly and adequately investigate complaints submitted to DSS, and that this failure was the product of "deliberate indifference" towards the "constitutional rights of persons investigated by DSS" and the cause for the violation of Plaintiff's rights.[13] Compl. [DE-1 ¶¶ 102-06. Defendants assert that Plaintiff's complaint contains only conclusory allegations insufficient to "support . . . a policy or custom attributable to Defendant Perry or that such policy or custom proximately caused the constitutional depravation that Plaintiff alleges." Defs.' Mem. [DE-26] at 7-8. The court finds the allegations contained in Plaintiff's complaint sufficient to assert a derivative failure to train claim.

Plaintiff alleges that it was the policy and/or custom of Defendant Perry, as Director of DSS, (1) to inadequately and improperly investigate complaints or to have unqualified and untrained

---

[13]     To the extent that Plaintiff's complaint can be read to include a derivative § 1983 claim against Defendant Perry for an express decision authorizing the alleged conduct violating Plaintiff's rights, the court recommends such claim be dismissed for failure to adequately state such a claim. Compl. [DE-1] ¶ 104 ("Additionally, supervisory employees may have directly authorized or directed the activities complained of herein."). Plaintiff's complaint has not alleged the necessary involvement on the part of Defendant Perry to show that he officially sanctioned or ordered the alleged conduct. *See Love-Lane v. Martin*, 355 F.3d 766, 782-83 (4th Cir. 2004).

30

employees conduct investigations and (2) to inadequately supervise and train employees thereby failing to discourage constitutional violations by employees. Compl. [DE-1] ¶¶ 102 - 103. Plaintiff alleges further that Defendant Perry failed to require appropriate in-service training of employees. *Id.* ¶ 103. As a result of these policies and/or customs, DSS employees believed their actions would not be properly monitored by supervisory personnel and that misconduct would not be investigated or punished, but would be tolerated. *Id.* ¶ 104. According to Plaintiff, Defendant Perry's policies and customs demonstrate a deliberate indifference to the constitutional rights of persons investigated by DSS. *Id.* ¶ 105. These allegations are sufficient to provide DSS notice of the nature of Plaintiff's claim and the grounds on which it rests, and it does not appear beyond doubt that there is no set of facts which Plaintiff could prove in support of this claim which would entitle Plaintiff to relief. *See Jordan*, 15 F.3d at 339-340 (holding that a plaintiff seeking to impose municipal liability under § 1983 must satisfy the usual requirements of notice pleading specified by Rule 8 of the Federal Rules.).

Since Plaintiff's derivative liability claim survives review at this point, the court must consider whether derivative liability may extend to the actions of Defendant Curtis. The court elects to determine this issue by examining the sufficiency of the § 1983 allegations against Defendant Curtis. As noted previously, a § 1983 action can only lie if the individual was acting under color of state law. *Jenkins*, 119 F.3d at 1159-60. The clearest case of state action is a public official who carries out his or her official responsibilities; however, private individuals may be deemed to have acted under color of state law when it can be sufficiently said that the state is responsible for that individual's actions. *See West v. Atkins*, 487 U.S. 42, 49 (1988) (recognizing that public employment is generally sufficient to render an individual a state actor, but that a private actor may

31

also act under color of state law when they assume a relationship with the state such that the conduct of the private actor is fairly attributable to the state).

It is clear from Plaintiff's complaint that Defendant Curtis is neither an employee of DSS nor a public official. Rather, Plaintiff's complaint affirmatively alleges that Defendant Curtis is a private individual employed by Plaintiff as an in-home caregiver. Compl. [DE-1] ¶ 6. However, Plaintiff contends that Defendant Curtis acted as a "de facto agent" or "spy" for DSS by making false reports to DSS of activities occurring inside the home and by stealing private documents and discussing their contents with DSS. *Id.* ¶¶ 6, 32. There has been no suggestion, apart from Plaintiff's conclusory allegations that Defendant Curtis acted "at [the] behest" and "under the direction and control" of DSS, that the alleged conduct was significantly encouraged or coerced by DSS so as to create a sufficient nexus between Defendant Curtis and DSS. *Id.*; *see Blum v. Yaretsky*, 457 U.S. 991, 1002-04 (1982) (stating that a state can only be held responsible for a private actor when the state has exercised coercive power or given significant encouragement so that the conduct must be deemed to be that of the state). These allegations are not sufficient to bring Defendant Curtis' actions within the realm of state action. Accordingly, Defendant Perry may not be derivatively liable for the alleged conduct of Defendant Curtis. The court emphasizes that, although it concludes Plaintiff's allegations against Defendant Curtis fail in this regard, this conclusion is for the limited purpose of determining the extent of Defendant Perry's derivative liability and does not impact the claims currently pending against Defendant Curtis.

Accordingly, the court recommends that Defendants' motion to dismiss be denied as to Plaintiff's derivative claim for failure to train and supervise against Defendant Perry. However, the only sufficiently alleged predicate offense is the procedural due process violation asserted against

32

Defendants Million and Ross. Therefore, derivative liability may only extend to this claim since no other predicate act has been sufficiently alleged.

## C. *Plaintiff's State Law Claims*

### i. *Abuse of Process*

Plaintiff's complaint alleges a state law claim under North Carolina law against all Defendants for abuse of process and states that Defendants "initiated legal process against Plaintiff for a malevolent, ulterior motive or purpose." Compl. [DE-1] ¶ 111. However, Plaintiff does not clearly indicate whether her claim relies on the civil suit or criminal proceeding instituted against her. *Id.* ¶¶ 2, 72, 73, 81-85, 111. Defendants contend that Plaintiff's claim for abuse of process must fail because Plaintiff has alleged misuse in the filing of a legal proceeding, not misuse after the institution of a legal proceeding. Defs.' Mem. [DE-26] at 16.

"[A]buse of process is the misuse of legal process for an ulterior purpose. It consists in the malicious misuse or misapplication of that process *after issuance* to accomplish some purpose not warranted or commanded by the writ." *Fowle v. Fowle*, 263 N.C. 724, 728, 140 S.E.2d 398, 401 (1965); *see Chidnese v. Chidnese*, 210 N.C. App. 299, 310, 708 S.E.2d 725, 734-35 (2011) ("Abuse of process requires both an ulterior motive and an act in the use of the legal process not proper in the regular prosecution of the proceeding."). "[T]he gravamen of a cause of action for abuse of process is the improper use of the process *after it has been issued.*" *Petrou v. Hale*, 43 N.C. App. 655, 659, 260 S.E.2d 130, 133 (1979) (emphasis added). North Carolina courts have routinely held that dismissal of an abuse of process claim is appropriate when a plaintiff has not alleged that a defendant misused process after proceedings had been initiated. *See Erthal v. May*, __ N.C. App. __, 736 S.E.2d 514, 524 (2012) (holding that defendants failed to state a claim for abuse of process where

33

defendants only alleged that plaintiffs filed the suit with an ulterior motive and failed to allege an improper act after the initiation of the suit); *Hewes v. Johnston*, 61 N.C. App. 603, 604, 301 S.E.2d 120, 121 (1983) (no abuse of process claim when complaint "alleges a motive of harassment in the filing of suit by third-party defendants, but there is no allegation of an improper wilful act during the course of the proceedings"); *Stanback v. Stanback*, 297 N.C. 181, 201, 254 S.E.2d 611, 625 (1979) (affirming the dismissal of an abuse of process claim when the plaintiff failed to allege that defendant did anything improper in the regular course of the proceeding once the suit had been initiated). Courts hold that "[t]he ulterior motive requirement is satisfied when the plaintiff alleges that the prior action was . . . to achieve a purpose not within the intended scope of the process." *Hewes v. Wolfe*, 74 N.C. App. 610, 614, 330 S.E.2d 16, 19 (1985); *Mfrs. & Jobbers Fin. Corp. v. Lane*, 221 N.C. 189, 189, 19 S.E.2d 849, 853 (1942) (holding there is no abuse of process when the process is "confined to its regular and legitimate function in relation to the cause of action stated in the complaint").

Here, review of Plaintiff's complaint reveals that the complaint fails to sufficiently allege an action for abuse of process. First, irrespective of whether Plaintiff's claim is predicated on the civil or criminal proceeding instituted against her, Plaintiff has not alleged any improper act on the part of Defendants following the institution of either proceeding. Plaintiff has merely alleged an improper act in the filing of the actions which cannot constitute abuse of process. Moreover, Plaintiff's complaint does not appear to sufficiently allege the presence of an ulterior motive. Essentially, Plaintiff alleges that Defendants have used the legal process to deprive her of "her freedom and her liberty," property, and contact with her mother. Compl. [DE-1] ¶ 72. However, these alleged "ulterior motives" are just what the processes are intended to accomplish, thereby

34

foreclosing the possibility that Defendants sought to achieve a purpose for which the legal processes were never intended. *See Roberts v. Huckabee*, No. COA-12-1352, 2013 WL 2183758, at \*4-5 (N.C. App. May 21, 2013). Plaintiff may contend these purposes are improper, but the processes are intended to accomplish exactly those ends. Accordingly, this court recommends that Plaintiff's abuse of process claim against Defendants be dismissed.

### ii. *Intentional Infliction of Emotional Distress ("IIED")*

Plaintiff's complaint alleges a state law claim against all Defendants for intentional infliction of emotional distress and states that Defendants "engaged in extreme and outrageous conduct in knowingly persecuting civil action against" Plaintiff which "cause[d] severe emotional distress." Compl. [DE-1] ¶¶ 115-16. Defendants contend that Plaintiff's IIED claim must fail because Plaintiff has failed to allege both "extreme and outrageous" conduct and "severe emotional distress." Defs.' Mem. [DE-26] at 14.

In North Carolina, intentional infliction of mental distress consists of: (1) extreme and outrageous conduct; (2) that is intended to cause severe emotional distress to another; and (3) that does in fact cause severe emotional distress to another. *Holloway v. Wachovia Bank & Trust Co.*, 339 N.C. 338, 351, 452 S.E.2d 233, 240 (1994). Whether the alleged conduct is sufficiently extreme and outrageous is a question of law. *Mitchell v. Lydall, Inc.*, No. 93-1374, 1994 WL 38703, at \*3 (4th Cir. Feb. 10, 1994). To be considered "extreme and outrageous" the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (citations and quotation omitted). Further, the North Carolina Supreme Court has adopted the following standard for an IIED claim: "the term 'severe emotional distress' means any emotional or mental disorder,

35

such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." *Waddle v. Sparks*, 331 N.C. 73, 83, 414 S.E.2d 22, 27 (1992) (quoting *Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A.*, 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990)).

Upon review of Plaintiff's complaint, the court finds that Plaintiff has failed to sufficiently allege an IIED claim. Without deciding whether Defendants' alleged conduct qualifies as "extreme and outrageous," it is immediately apparent that Plaintiff's complaint is devoid of factual allegations demonstrating Plaintiff suffered severe emotional distress. Plaintiff's complaint merely alleges that Defendants' acts did in fact cause severe emotional distress and without alleging facts showing the presence of severe emotional distress. Plaintiff's vague allegations, even if true, do not meet the emotional distress standard set forth by the North Carolina Supreme Court. Accordingly, this court recommends that Plaintiff's IIED claim against Defendants be dismissed.

## IV. CONCLUSION

For the reasons stated above, this court RECOMMENDS Defendants' motion to dismiss be ALLOWED in part and DENIED in part.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

36

Submitted the 31st day of July, 2013.

Robert B. Jones, Jr.
United States Magistrate Judge